UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STERLING HUNTLEY, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) No. 15 CV 8347 ) |
| v. | ) Judge Thomas M. Durkin ) |
| CHICAGO BOARD OF OPTIONS EXCHANGE; OPTIONS CLEARING CORPORATION; and JOHN DOE (MARKET MAKER), | ) ) ) ) ) |
| Defendants. | ) |

# MEMORANDUM OPINION AND ORDER

Plaintiff Sterling Huntley filed a two-count amended complaint on behalf of himself and all others similarly situated against Defendants Chicago Board of Options Exchange ("CBOE"), Options Clearing Corporation ("OCC"), and John Doe (Market Maker). The original complaint was filed on June 1, 2015 in the Northern District of Georgia, but the case was transferred to this district on September 23, 2015. The amended complaint alleges violations of the Securities Exchange Act ("the Act"), as well as fraud and unfair business practices under Georgia law. Currently ripe for decision is the motion to dismiss previously filed by Defendants on July 9, 2015, before the case was transferred to this Court. For the reasons set forth below, the Court now grants Defendants' motion to dismiss.

## LEGAL STANDARD

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th

Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

## BACKGROUND

The well-pleaded facts of the complaint, accepted as true for purposes of this motion, show the following. Plaintiff Huntley is a resident of Georgia who purchased stock options on the Chicago Board of Options Exchange. R. 9 (Compl., ¶ 3).[1] Defendant CBOE is a national securities exchange where stock option contracts are bought and sold. *Id.* (Compl., ¶ 4). Defendant OCC is a clearinghouse

---

[1] Options contracts are securities that give investors the right to buy or sell specific securities at a specified price within a specified time. R. 9 (Compl., ¶ 15).

that facilitates the buying and selling of stock option contracts by serving as the issuer of those contracts. *Id.* (Compl., ¶ 5). The OCC "is the world's largest equity derivatives clearing organization," and "is dedicated to promoting stability and financial integrity in the marketplaces that it serves by focusing on sound risk management principles" and "acting as guarantor . . . [to] ensure[ ] that the obligations of the contracts it clears are fulfilled." *Id.* (Compl., ¶ 6).

In November 2012, Plaintiff purchased options contracts with funds from two trading accounts held in his name. *Id.* (Compl., ¶ 18). Specifically, Plaintiff purchased over 29,000 $1.00 LEAPS "put" options of the UVXY series expiring in January 2015 at $0.35 each. *Id.*[2] Plaintiff alleges that he purchased the options based on his calculation that each of the $1.00 "put" options would be worth $0.45 if the price of UVXY fell to $0.55 by January 2015. *Id.* (Compl., ¶ 17). During the more than two years that Plaintiff held the options, the underlying shares underwent two reverse splits declared by the issuer of UVXY. *Id.* (Compl., ¶¶ 19-20).[3] When a stock split occurs, OCC is supposed to adjust the investor's options holding "to reflect the proportion of the split, in a manner that the investor will end up with the same rights that he or she had before the split. This is accomplished by giving the

---

[2] A "put" option gives the holder the right to sell the stock at the "strike price" during the life of the option. R. 9 (Compl., ¶ 15). "LEAPS" are Long-Term Equity Anticipation Securities Options, which means an option contract that expires one year or more in the future. *Id.* Thus, the options Plaintiff purchased gave him the right to sell shares of UVXY at $1.00 per share until the options expired in January 2015.

[3] A reverse stock split is a corporate action in which a company reduces the number of shares of stock and increases the share price of the stock proportionately. R. 9 (Compl., ¶ 15).

3

investor the same aggregate contract value or net position value that he or she had before the split." *Id.* (Compl., ¶ 16). As a result of the first UVXY reverse stock split, the OCC adjusted Plaintiff's options so that his net position in those options did not change. *Id.* (Compl., ¶ 19). As a result of the second UVXY reverse stock split, however, the adjustment issued by the OCC resulted in a change in Plaintiff's position value in the UVXY options. *Id.* (Compl., ¶¶ 20-23).

Because of the second adjustment made by the OCC, the market value of Plaintiff's options dropped overnight, and Plaintiff suffered significant losses. *Id.* (Compl., ¶ 24). Plaintiff seeks a declaratory judgment establishing among other things that Defendant John Doe (Market Maker) has been unjustly enriched by the OCC's adjustments, while Plaintiff and others similarly situated have been harmed. R. 9 at 21 (Prayer for Relief, ¶ f).[4] Plaintiff asks the Court to order Defendant John Doe (Market Maker) to pay back any funds it received from the reverse stock split action taken by the OCC, which caused Plaintiff and all others similarly situated to lose money. *Id.* at 22 (Prayer for Relief, ¶ l). Plaintiff also seeks a declaration among other things that, after the OCC's adjustment, Plaintiff "did not end up with a net

---

[4] A "market maker" is "an exchange member whose function is to aid in the making of a market, by making bids and offers for his account in the absence of public buy or sell orders." R. 9 (Compl., ¶ 9); *see also Citadel Sec., LLC v. Chi. Bd. Options Exch.*, __ F.3d __, 2015 WL 8536713, at *1 (7th Cir. Dec. 11, 2015) (where plaintiffs were the "market makers," defined by the court as "securities firms and members of the exchanges[,] [who] operate . . . under the exchanges' rules . . . [to] compete for customer order flow by displaying buy and sell quotations for particular stocks"). Plaintiff alleges that the identity of the market maker or makers for the particular security at issue in this case will be uncovered in discovery. R. 9 (Compl., ¶ 9). Because Defendant John Doe (Market Maker) has not yet been identified or served, references herein to "Defendants" are to the two exchange defendants who have appeared in this matter.

4

position value, which is equivalent to his position before the split," and that "Article VI Section 11A of OCC bylaws makes all Put options worthless, not just $1 or $2 strikes, if the stock were to undergo 7 reverse stock splits." *Id.* at 21 (Prayer for Relief, ¶¶ b, d). Plaintiff seeks an injunction ordering among other things that the CBOE "stop listing the UVXY options series immediately or until such time [as] the problem is corrected," that the OCC "stop adjusting all stock options with the current reverse stock split rules outlined in Article VI Section 11A of the OCC bylaws until such time the problem is corrected," and that the OCC "stop clearing UVXY options to open immediately, until such time [as] the problem is corrected." *Id.* (Prayer for Relief, ¶¶ h-j).

## DISCUSSION

Defendants have moved to dismiss the complaint based on the doctrine of regulatory immunity. It is well established that self-regulating organizations ("SROs") are immune "from suit for conduct falling within the scope of the SRO's regulatory and general oversight functions." *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 105 (2d Cir. 2001). "'[A]bsolute immunity is particularly appropriate in the unique context of the self-regulation of the national securities exchanges,' where [the exchanges' 'perform[ ] *a variety of regulatory functions* that would, in other circumstances, be performed by [the SEC]." *Id.* (quoting *Barbara v. N.Y. Stock Exch., Inc.,* 99 F.3d 49, 59 (2d Cir. 1996) (emphasis added)).

> The [SRO] thus stands in the shoes of the SEC in carrying out these functions. Because the SEC would enjoy absolute immunity from suit if it carried out these responsibilities itself, SROs have similar immunity when

5

exercising functions delegated to them by the SEC. Moreover, absolute immunity must be absolute, because only such immunity can protect regulatory agencies from the fear of burdensome damage suits that would inhibit the exercise of their independent judgment.

*Dexter v. Depository Trust & Clearing Corp.*, 406 F. Supp. 2d 260, 263 (S.D.N.Y. 2005) (internal quotation marks and citations omitted), *aff'd,* 219 Fed. App'x 91 (2d Cir. 2007).

"The term 'self-regulatory organization' means any national securities exchange, registered securities association, or registered clearing agency . . . ." 15 U.S.C. § 78c(a)(26). Plaintiff admits that the CBOE and the OCC are SROs. *See* R. 9 (Compl., ¶ 4) (alleging that the CBOE is a national securities exchange registered with the SEC); *id.* (Compl., ¶ 7) (alleging that the "OCC operates under the jurisdiction of both the SEC and the Commodity Futures Trading Commission ('CFTC')," and that, "[a]s a registered clearing agency under SEC jurisdiction, [the] OCC clears transactions for exchange-listed options, security futures and Over-the-Counter options").[5] Plaintiff further agrees that if Defendants were acting under the aegis of their regulatory duties, they are entitled to assert regulatory immunity to the claims in this case. R. 29 at 8. Plaintiff alleges, however, that "[t]he doctrine of

---

[5] *See also In re Stock Exchs. Options Trading Antitrust Litig.*, 317 F.3d 134, 139 (2d Cir. 2003) (discussing the history of the SEC's regulation of options trading on securities exchanges, including the CBOE); *Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC,* 2007 WL 604984, at *1-2 (N.D. Ill. Feb. 23, 2007) (the "CBOE operates a national securities exchange and specializes in the trading of standardized securities options," and the "OCC is the sole issuer of standardized options contracts traded by U.S. options exchanges"); *id.* at 2 ("[a]ll standardized securities options must be traded on a national securities exchange registered with and regulated by the United States Securities and Exchange Commission").

6

regulatory immunity does not apply in this case because Defendants Chicago Board of Options Exchange and Options Clearing Corporation's conduct in violation of the Act was not done under their regulatory functions." R. 9 (Compl., ¶ 2).

Plaintiff's conclusory allegation that Defendants were not acting within the scope of their regulatory functions does not withstand scrutiny given the factual allegations in the complaint. *See D'Alessio,* 258 F.3d at 105-06 ("In determining whether the NYSE is entitled to absolute immunity from suit in the present case, we look . . . to the alleged misconduct of the NYSE as detailed in the complaint."). The complaint alleges that Defendants used a "flawed" methodology to adjust Plaintiff's "put" options after the reverse stock split, and that Defendants misrepresented the value of the UVXY options given what the value of those options turned out to be after the OCC made the adjustments called for by Article VI, Section 11A of the OCC's By-Laws. Plaintiff further alleges that the OCC failed to disclose that the value of the "put" options could change as a result of a reverse stock split, and failed to honor its guarantee that the obligations of the contracts it clears will be fulfilled. It is clear from these allegations that Plaintiff is asserting, not that the price adjustments at issue were outside Defendants' regulatory functions, but that Defendants implemented their regulatory function in a manner that harmed or defrauded Plaintiff and similarly situated investors.

The purpose of absolute immunity is to protect all conduct of an SRO from liability, so long as the conduct arises out of the discharge of its duties under the Exchange Act. Thus, assuming arguendo that the OCC's methodology in valuing

Plaintiff's "put" options after the stock split was "flawed" and that the methodology caused Plaintiff's losses in contravention of the OCC's "guarantee," Defendants still enjoy immunity from Plaintiff's claims. As the Second Circuit explained, "immunity depends only on *whether* specific acts and forbearances were incident to the exercise of regulatory power, and not on the propriety of those actions or inactions. Indeed, if . . . immunity only attaches to those who follow the law, the immunity doctrine would be effectively subverted. After all, individuals characteristically do not bring suit alleging an SRO is obeying its statutory and legal obligations; they bring suit alleging an SRO is violating the law or acting inconsistently with its legal obligations." *In re NYSE Specialists Sec. Lit.*, 503 F.3d 89, 98 (2d Cir. 2007) (emphasis in original); *see also Dexter,* 406 F. Supp. 2d at 263 ("There would be no point to an immunity that only protected actions that were in any event correct. Since absolute immunity must be absolute, it must protect even actions that a plaintiff could ultimately establish were in violation of law.") (internal quotation marks and citation omitted).

Plaintiff appears to acknowledge that his claims fall generally within the regulatory immunity principle discussed above but argues for an exception based on what he claims to be unique circumstances. According to Plaintiff, the adjustment formula used by the OCC is *so* flawed that if the formula adjustment were to be applied to any "put" option enough times, the ultimate effect of those multiple adjustments would be to render the "put" option completely worthless. Plaintiff argues that, because the OCC's adjustment formula has the potential to destroy all

8

value in all "put" options, it is tantamount to fraud. But again, this argument runs directly against the rationale for the regulatory immunity doctrine as discussed in the case law cited above. If courts were to allow a fraud exception to the doctrine of regulatory immunity, the exception would swallow the rule. *See, e.g., In re NYSE Specialists Sec. Lit.*, 503 F.3d at 98 n.3 (rejecting argument that "absolute immunity is inappropriate where an SRO has either recklessly permitted or knowingly fostered wrongdoing and fraud"); *DL Capital Group, LLC v. NASDAQ Stock Market, Inc.*, 409 F.3d 93 98 (2d Cir. 2005) ("precedent, not to mention common sense, strongly militates against carving out a 'fraud' exception to SRO immunity"); *see also Sparta Surgical Corp. v. Nat'l Ass'n of Secs. Dealers, Inc.*, 159 F.3d 1209, 1215 (9th Cir. 1998) (rejecting a bad faith exception to the immunity doctrine and holding that SROs "enjoy freedom from civil liability when they act[ ] in their regulatory capacity," even where they "act[ ] in a capricious, even tartuffian manner which cause[s] . . . enormous damage").

Moreover, such an exception would be particularly inappropriate here, where the actions challenged by Plaintiff presumably resulted in both winners and losers in the marketplace, and where Plaintiff does not allege that the challenged actions conferred any particular benefit on Defendants.[6] That Plaintiff's claims in this case

---

[6] The Court notes that correspondence to Plaintiff from Defendants attached to the complaint acknowledges Plaintiff's arguments for why the formula used by the OCC in calculating adjustments may have disproportionately caused losses to certain classes of market participants. The correspondence notes that Plaintiff's concerns have been brought to the attention of the Securities Committee of the OCC, which makes the adjustment decision. Balancing the respective interests of market participants is more appropriately done in the context of regulatory rule-making

9

focus on the formula used by the OCC to calculate the adjustment it applied to Plaintiff's options proves that Plaintiff is questioning a regulatory function of the OCC. As the complaint acknowledges, the adjustment formula in question, Section 11A, is part of the OCC's By-Laws, and the OCC's By-Laws are regulated by the SEC. *See McDaniel v. Wells Fargo Invests., LLC,* 717 F.3d 668, 673 (9th Cir 2013) (citing 15 U.S.C. § 78s(b), and stating that SROs have "the power to promulgate rules that, once adopted by the SEC, have the force of law"). Far from establishing a basis for overcoming Defendants' regulatory immunity, Plaintiff's argument concerning the impact of the adjustment formula established by Section 11A on a specific segment of the market proves that regulatory immunity applies here.[7]

---

rather than civil litigation because the latter, by its nature, takes into account only the interests of the private litigants who are before the court.

[7] The OCC's By-Laws are referenced in the complaint (R. 9 at 21), and available at http://www.optionsclearing.com/components/docs/legal/rules_and_bylaws/occ_bylaws.pdf. They provide in relevant part that "all adjustments to the terms of outstanding cleared contracts shall be made by the Securities Committee [of the OCC], which shall determine whether to make adjustments to reflect particular events in respect of an underlying interest, and the nature and extent of any adjustment, based on its judgment as to what is appropriate for the protection of investors and the public interest . . . ." OCC By-Laws, Section 11(a) (R. 23-2 at 2). The OCC's adjustment decisions are "within the sole discretion of the Securities Committee," and are "conclusive and binding on all investors and not subject to review." OCC By-Laws, Section 11(b) (R. 23-2 at 2). "The Securities Committee may, in addition to determining adjustments on a case-by-case basis, adopt statements of policy or interpretations having general application to specified types of events or specified kinds of cleared contracts." OCC By-Laws, Section 11(a) (R. 23-2 at 2). Section 11A of the By-Laws, which is the provision Plaintiff challenges, is an example of a specific adjustment formula adopted by the Securities Committee to apply in the situation, among others, where the underlying security undergoes either a stock split or a reverse stock split. *See* R. 23-2 at 4.

Plaintiff cites to *Weissman v. National Association of Securities Dealers, Inc.*, 500 F.3d 1293, 1297 (11th Cir. 2007), for the proposition that SROs do not have complete immunity from lawsuits. While Plaintiff is correct that the case law draws a line between immune and non-immune conduct, the relevant question for this Court is which side of the immunity line the conduct at issue here falls. To avoid Defendants' regulatory immunity, Plaintiff would have to allege facts plausibly showing that Defendants were "acting in [their] own interest[s] as [ ] private entit[ies]," *id.* (internal quotation marks and citations omitted), as opposed to within the ambit of their regulatory function. While in some situations the conduct at issue falls on the non-immune side of the line between regulatory and private conduct, this is not one of those situations.[8] The specific functions at issue here are

---

[8] *Compare Weissman*, 500 F.3d at 1299 (advertisements alleged by the complaint were in furtherance of exchange's "private business activity"); *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 2015 WL 5052538, at *10 (S.D.N.Y. Aug. 26, 2015) (exchange's provision of co-location services held comparable to "the provision of commercial products and services that courts have held not to be protected by absolute immunity in other cases"); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 452 (S.D.N.Y. 2013) (denying absolute immunity with respect to an exchange's design of software and promotion of its ability to facilitate an initial public offering); *Platinum Partners Value Arbitrage Fund, Ltd. P'ship v. Chi. Bd. of Options Exch.*, 976 N.E.2d 415, 424 (Ill. App. 2012) (denying immunity where plaintiff alleged that "defendants CBOE and OCC knowingly shared the information about the price adjustment with only certain market participants, [ ] allow[ing] those participants to profit from that information by selling the IFN put options to plaintiff, which was unaware of the looming price reduction"); *see also Kundrat v. Chi. Bd. Options Exch.*, 2002 WL 31017808, at *8-9 (N.D. Ill. Sept. 6, 2002) (where plaintiffs alleged, inter alia, that the SRO defendants attempted to prevent the plaintiffs from earning substantial trading profits by imposing severe reporting requirements on the plaintiffs' clearing firms and circulated to clearing firms a blacklist letter, which allegedly falsely accused the plaintiffs of potential trading abuses, court deferred ruling on regulatory immunity argument and denied the defendant SROs' motion to dismiss

the OCC's listing and adjustment after a reverse stock split of the UVXY options contracts, and those functions fall squarely within Defendants' regulatory function. *See Grisanti v. Options Clearing Corp.,* Civil Case No. 09-3424, Opinion & Order dated Jan. 4, 2010 (D.N.J) ("by converting options as part of a merger and adjusting the value of the options contracts, OCC was acting directly within the scope of its delegated authority pursuant to its rules and bylaws as an SRO"); *see also Platinum Partners Value Arbitrage Fund, Ltd. P'ship,* 976 N.E.2d at 422 (where plaintiff "concede[d] that the adjustment of IFN's strike price was a regulatory decision, serving to protect investors," but where court held that, "while the price adjustment itself may have been a regulatory decision, the manner in which it was disclosed— privately and prematurely—to the John Doe defendants was not"); *cf. Sparta Surgical Corp.,* 159 F.3d at 1214 ("there are few functions more quintessentially regulatory than suspension of trading").

---

with leave to reassert that argument later because the court thought it was unclear, at that stage of the proceeding, whether the defendant SROs were performing regulatory acts).

## CONCLUSION

Defendants' motion to dismiss raises several issues other than regulatory immunity, but the Court need not address those other issues. The amended complaint is barred by the doctrine of regulatory immunity, and, accordingly, Defendants' motion to dismiss [R. 23] is granted.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: December 21, 2015